UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WALTER COLLETTE, JR., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | 21-11392-FDS |
| v. ) | |
| ) | |
| SIG SAUER, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS**

SAYLOR, C.J.

This is a case arising out of an alleged defective discharge of a police officer's service pistol. Plaintiff Walter Collette, Jr., a Somerville police officer, alleges that he was walking into his motorcycle club for dinner when his pistol unexpectedly fired, wounding him in the leg. He has sued the pistol's manufacturer, Sig Sauer, Inc., for violations of state and federal law.

Sig Sauer has moved to dismiss Counts 1, 4, 7, and 8 for failure to state a claim upon which relief can be granted. For the following reasons, that motion will be granted in part and denied in part.

**I.      Factual and Procedural Background**

Unless otherwise noted, the following facts are as alleged in the complaint.

**A.      The Parties**

Walter Collette, Jr., has been a Somerville police officer for approximately 20 years. (Compl. ¶ 1). According to the complaint, he has substantial experience with firearms and has received numerous awards and commendations from the Somerville Police Department. (*Id.*

¶ 19).

Sig Sauer, Inc., manufactures, markets, and distributes firearms throughout the world. It has a principal place of business in Newington, New Hampshire. (*Id.* ¶ 18). It manufactures a pistol known as the P320.

### B.  The Discharge of the Pistol

The complaint alleges that on July 23, 2019, Collette was working an eight-hour shift when he decided to take his dinner break at a motorcycle club to which he belonged. (*Id.* ¶ 20). He removed his gun belt and secured his service-issued P320 by wrapping it in a cloth and stowing it in his gym bag. (*Id.*). He slung the strap of the gym bag over his right shoulder and walked toward the club. (*Id.* ¶ 21). According to the complaint, as he was walking, the P320 unexpectedly fired without Collette or any item in the gym bag touching the trigger. (*Id.* ¶ 22). The bullet entered the back of Collette's left calf and exited the front of his left leg, causing serious injury. (*Id.*).

The complaint alleges that an inadequate sear-striker connection, inadequate internal striker safety, and other defects internal to the gun's slide rendered the gun unreasonably dangerous. (*Id.* ¶¶ 69-70). The defective design and manufacture of the gun has allegedly led to an extensive history of defective discharges. (*See id.* ¶¶ 71-121).

### C.  Background of P320

In January 2014, Sig Sauer introduced the P320 to the North American market. (*Id.* ¶ 5). According to the complaint, it was Sig Sauer's first "strike-fired" pistol, which differs from traditional pistols in that the P320 has no external hammer that must be pulled back to "cock" the gun. (*Id.* ¶ 4 & n.1). Instead, an internal, spring-loaded "striker" is used to fire the weapon. (*Id.*). Sig Sauer used the same frame and fire control unit that it had designed for the P250, an earlier hammer-fired model. (*Id.* ¶ 33).

Before the July 2019 incident that wounded Collette, Sig Sauer stated in its marketing materials:

> Safety Without Compromise:
>
> We've designed safety elements into every necessary feature on this pistol. From the trigger, to the striker and even the magazine, the P320 won't fire unless you want it to.

(*Id.* ¶ 23). In other marketing materials, Sig Sauer stated that the P320's safety prevents the striker from releasing unless the trigger is pulled. (*Id.* ¶ 24). However, in the P320 owner's manual, Sig Sauer warned that the P320 could fire if dropped. (*Id.* ¶ 25).

In 2016, Sig Sauer competed for a $580 million contract to supply the U.S. Army's new service pistol. (*Id.* ¶ 34). According to the complaint, the prototype P320 exhibited more than 200 malfunctions during military testing. (*Id.*). Defects noted in the P320 included a failure to eject shell casings, a failure to fire, and the possibility that the pistol could discharge when dropped. (*Id.*). The complaint alleges that the Department of Defense notified Sig Sauer of the malfunctions and required that it fix the design flaws in the P320 by replacing the internal firing system. (*Id.* ¶¶ 35, 61-62).

The complaint further alleges that incidents of unintentional discharge across the country were also noted by law-enforcement personnel using the P320. (*Id.* ¶¶ 36, 41, 48). In 2016, a police department in Florida warned Sig Sauer that the P320 could fire without a trigger pull. (*Id.* ¶ 36). In February 2017, Sig Sauer sent an employee to Roscommon, Michigan, to investigate a possible defective discharge. (*Id.* ¶¶ 41-43). On August 4, 2017, a police officer from Stamford, Connecticut, filed suit against Sig Sauer alleging that his P320 discharged and shot him in the knee after falling to the ground. (*Id.* ¶ 48).

According to the complaint, Sig Sauer issued a press release that reaffirmed the safety of the P320 on August 4, 2017. (*Id.* ¶ 50). However, the press release did warn that exposure to

"acute conditions," including "shock, vibration, [or] heavy or repeated drops," could negatively impact the P320's safety mechanisms, causing them "to not work as designed." (*Id.* ¶¶ 50-51).

The complaint further alleges that on August 14, 2017, Sig Sauer announced a "Voluntary Upgrade Program" that would alter the weight of the trigger, sear, and striker, as well as add a mechanical disconnector. (*Id.* ¶ 53). Sig Sauer said these improvements had "nothing to do with drop safety" and represented an "alternate design" of the P320. (*Id.* ¶¶ 53, 56).

In 2017, Sig Sauer also revised the P320 owner's manual to incorporate the press-release language that the P320 could fire when exposed to "shock, vibration, [or] heavy or repeated drops." (*Id.* ¶ 66).

### D. Procedural Background

Collette initiated this lawsuit on August 25, 2021. The complaint alleges claims for strict product liability; negligence; breach of implied warranty of merchantability; breach of implied warranty of fitness; negligent infliction of emotional distress; intentional infliction of emotional distress; violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 11; and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2308(a). Sig Sauer has moved to dismiss Counts 1, 4, 7, and 8 for failure to state a claim upon which relief can be granted.

## II. Legal Standard

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When

4

determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

### III. Analysis

#### A. Strict Liability (Count 1)

Count 1 alleges an action in strict liability. Defendant contends that Massachusetts does not recognize causes of action in strict liability. Instead, Massachusetts law mandates that the exclusive cause of action for injuries caused by allegedly defective products is breach of implied warranty. Because the pleadings here allege claims for both strict liability and breach of warranty, defendant contends that the strict-liability claim should be dismissed as a matter of law.

Plaintiff does not appear to disagree. He contends that liability under a theory of strict liability, as set forth in the Restatement (Second) of Torts § 402A, is subsumed by the expansive scope of Massachusetts's warranty protections.

In any event, "[t]here is no independent claim of 'strict liability in tort' under Massachusetts law, and the sole remedy for strict liability is provided under the U.C.C." *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 59 (1st Cir. 2021). However, "[u]nder applicable Massachusetts law, warranty liability is 'a remedy intended to be fully as comprehensive as the strict liability theory of recovery [of many other] jurisdictions.'" *Osorio v. One World Techs.*

5

*Inc.*, 659 F.3d 81, 84 (1st Cir. 2011) (quoting *Back v. Wickes Corp.*, 375 Mass. 633, 639 (1978)) (alteration in original). Thus, liability under the implied warranty of merchantability is "congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts § 402A." *Vassallo v. Baxter Healthcare Corp.*, 428 Mass. 1, 22 (1998) (quoting *Commonwealth v. Johnson Insulation*, 425 Mass. 650, 653-54 (1997)). Nevertheless, claims alleging strict liability for defective products must be brought "under the Massachusetts law governing warranties." *Jackson v. Johnson & Johnson & Janssen Pharms., Inc.*, 330 F. Supp. 3d 616, 627 (D. Mass. 2018).

Because there is no cause of action under Massachusetts law for strict liability, the motion to dismiss Count 1 will be granted.

### B. Breach of Implied Warranty—Fitness for Particular Purpose (Count 4)

Count 4 alleges a breach of implied warranty of fitness for a particular purpose. (Compl. ¶¶ 143-48).[1] Under Mass. Gen. Laws ch. 106, § 2-315, a warranty of fitness for a particular purpose arises when "(1) the seller had reason to know of the particular purpose for which the buyer required the goods, (2) the seller had reason to know of the buyer's reliance on the seller's skill or judgment in selecting or furnishing suitable goods, and (3) the buyer relied in fact." *Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp. 2d 194, 207 (D. Mass. 2000) (citing *Fernandes v. Union Bookbinding Co.*, 400 Mass. 27, 34 (1987)).[2] "A particular purpose differs from an ordinary purpose in that it envisages a specific use by the buyer that is peculiar to

---

[1] The title of Count 4 in the complaint labels this claim as one for breach of express warranty. However, in substance, the claim is one for a breach of implied warranty of fitness for a particular purpose. The Court will therefore construe it as such.

[2] Mass. Gen. Laws ch. 106, § 2-315 provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.

the nature of his business." *Pub. Serv. Mut. Ins. v. Empire Comfort Sys., Inc.*, 573 F. Supp. 2d 372, 381 (D. Mass. 2008) (quotation marks omitted).  If a complaint fails to allege a particular purpose, it "falls short of stating a viable claim." *Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 444 (D. Mass 2020).

Here, the complaint alleges that defendant impliedly warranted the gun as being suitable for the particular purpose of being stored in a holster that would be periodically removed from a service belt.  (*See* Compl. ¶¶ 144-45).  That purpose, according to defendant, falls within the ordinary usage of a firearm.[3]

Plaintiff contends that carrying the gun in a holster is a particular purpose peculiar to law enforcement because officers are frequently required to remove a holstered gun from their service belts or unholster their weapons.  In contrast, according to plaintiff, civilians using firearms in an ordinary fashion keep them in locked and secure locations when not using them.

Carrying a gun in a holster is part of the ordinary use of a firearm and is not particularized or unique to law enforcement.  The "ordinary purposes for which goods are used are those envisioned in the concept of merchantability and go to uses which are customarily made of the goods in question." *Rule v. Fort Dodge Animal Health, Inc.*, 604 F. Supp. 2d 288, 297 (D. Mass. 2009).  Surely, most civilians who legally carry pistols for self-defense do not put them in their pockets or waistbands.  And the use of a holster necessarily implies both the removal of a holster and the unholstering of the weapon.

In short, the complaint fails to allege a plausible claim for implied warranty of fitness for

---

[3] Defendant also contends that plaintiff cannot bring a claim for implied warranty of fitness because he did not purchase the pistol and therefore could not have relied upon defendant's expertise.  Plaintiff contends that a claim for breach of implied warranty does not require strict privity between buyer and seller, as long as the defendant might have reasonably expected the plaintiff to have been the ultimate user, or to have been affected by, the product sold.  The Court does not reach that issue.

7

a particular purpose, and therefore the motion to dismiss Count 4 will be granted.

    **C.**    **Mass. Gen. Laws ch. 93A (Count 7)**

Count 7 alleges violations of Mass. Gen. Laws ch. 93A, § 11, which is directed to unfair and deceptive acts and practices. Defendant contends that plaintiff lacks standing to bring a claim under Chapter 93A because 940 C.M.R. § 16.00 *et seq.*, which outlines unfair or deceptive practices in the sale of handguns, only applies to "handgun-purveyors." The definition of handgun-purveyors, as set forth in the regulation, excludes those who supply guns to law-enforcement officials for their official duties. 940 C.M.R. § 16.01. Because defendant is excluded from state regulations concerning handgun sales, defendant argues, plaintiff's claim under Chapter 93A cannot stand. Plaintiff asserts that the regulations do not encompass all prohibited practices under Chapter 93A or provide a safe harbor from liability for gun manufacturers.

The regulations in question state clearly that they are not intended to "describe all types of practices prohibited by [Chapter 93A]," nor do they "legitimize acts that are not specifically prohibited by 940 CMR 16.00." 940 C.M.R. 16.00. Rather, they are designed to "supplement existing statutes and regulations." *Id.* They provide consumers an additional basis upon which to bring a claim and do not otherwise impede a consumer's cause of action under Chapter 93A. *See Am. Shooting Sports Council, Inc. v. Att'y Gen.*, 429 Mass. 871, 878 (1999) (explaining that unfair or deceptive practices under Chapter 93A can be identified or defined through either "case-by-case adjudication" or "regulation by the Attorney General"). Thus, and whatever the merits of the Chapter 93A claim, the Attorney General's regulations under 940 CMR 16.00 do not foreclose plaintiff from asserting its claim.

The motion to dismiss Count 7 will therefore be denied.

D.     **Magnuson-Moss Warranty Act (Count 8)**

Count 8 alleges a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*. The MMWA provides a federal cause of action for "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract . . . ." 15 U.S.C. § 2310(d)(1). The statute also incorporates warranty protections afforded under state law through its definition of "consumer." *See* 15 U.S.C. § 2301(3).[4] A complaint can therefore state a claim by alleging either a violation of the MMWA's substantive provisions or by satisfying the requirements for a covered state-law cause of action. *See Monroe v. Medtronic, Inc.*, 511 F. Supp. 3d 26, 36 (D. Mass. 2021) ("The [MMWA] affords consumers a private cause of action for violations of the substantive provisions of the Act and for breach of a written or implied warranty." (internal quotation marks omitted)); *Pershouse v. L.L. Bean, Inc.*, 368 F. Supp. 3d 185, 191 (D. Mass. 2019) (stating that state law provides substantive law for an MMWA claim, except for when a substantive violation of the MMWA is alleged).

1.     **Substantive Claim under MMWA**

The complaint alleges that defendant expressly and impliedly warranted the gun's safety and then modified or disclaimed that warranty in violation of § 2308(a). (Compl. ¶¶ 178-79). Thus, plaintiff asserts a violation of a substantive provision of the MMWA, separate from any allegations made under substantive requirements provided by state law. 2 Matt Crockett, THE LAW OF PROD. WARRANTIES § 20:6 (February 2021 update) (describing § 2308(a) as a

---

[4] That provision provides:

The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).

9

substantive provision of the MMWA that provides a basis for a cause of action); *cf. Rokicsak v. Colony Marine Sales & Serv., Inc.*, 219 F. Supp. 2d 810, 817 (E.D. Mich. 2002) (stating that a violation of § 2308(a) creates a federal cause of action under § 2310(d) distinct from any state-law cause of action for breach of express or implied warranty).

Section 2308(a) of the MMWA provides:

> No supplier may disclaim or modify (except as provided in subsection (b)) any implied warranty to a consumer with respect to such consumer product if (1) such supplier makes any written warranty to the consumer with respect to such consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product.

The statute also defines a written warranty as:

> any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time . . . .

15 U.S.C. § 2301(6)(a). Taken together, to state a claim under § 2308(a), the complaint must allege (1) that the defendant provided a written statement (a) relating to the material or workmanship of the product and (b) promising defect-free performance and (2) that the defendant modified or disclaimed that warranty.

Here, the complaint alleges that defendant stated in its marketing materials that it had "designed safety elements into every necessary feature on this pistol" and that "the P320 won't fire unless you want it to." (Compl. ¶¶ 9, 23). That statement was contradicted, plaintiff alleges, by defendant's warning in the P320 owner's manual that the pistol may fire if dropped. (*Id.* ¶ 25). In addition, defendant's written warranty was allegedly modified or disclaimed when defendant issued a press release stating that "shock, vibration, [or] heavy or repeated drops" could cause the P320's safety mechanisms to malfunction. (*Id.* ¶ 50). Defendant later

incorporated that language into a revision of its warning in the P320 owner's manual.  (*Id.* ¶ 66).

Defendant argues that plaintiff fails to identify any "affirmation of fact or promise" relating to the pistol that would constitute an express warranty under Massachusetts law.  The definition of written warranty under the MMWA is more restrictive than that under the U.C.C.[5]  It follows, then, that defendant's objection also applies to an allegation that a written warranty exists as defined by the MMWA.

The dispositive inquiry is whether defendant's promotional materials are written warranties as defined by the MMWA.  In general, "[c]ourts have been wary about expanding the definition of 'written warranty' and have narrowly construed the term." *Gordon v. Sig Sauer, Inc.*, 2020 WL 4783186, at *7 (S.D. Tex. Apr. 20, 2020).  Promotional materials that simply describe the product in a flattering light do not extend warranty protections because "such statements do not guarantee performance or lack of defects." *Perez v. Monster Inc.*, 149 F. Supp. 3d 1176, 1183 (N.D. Cal. 2016) (quoting *Ruszeki v. Nelson Bach USA Ltd.*, 2015 WL 6750980, at *4 (S.D. Cal. June 25, 2015)); *see, e.g.*, *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, 2014 WL 4054240, at *12 (S.D.N.Y. Aug. 15, 2014) ("The words '100% cotton' and a stated thread count, however, cannot constitute a written warranty under the MMWA because neither of the labels promises that the sheets are defect-free . . . ."); *In re ConAgra Foods Inc.*, 908 F. Supp. 2d 1090, 1102 (C.D. Cal. 2012) ("The statement that

---

[5] Interpretive guidance from the Federal Trade Commission has explained that the definitions of written warranty under the MMWA and express warranty under the U.C.C. are not coextensive. *See* 16 C.F.R. § 700.3(a) (stating that the MMWA "imposes specific duties and liabilities" and that certain representations that would qualify as "express warranties" under the Uniform Commercial Code are not written warranties under the MMWA); *see also* Milton Schroeder, *Private Actions Under the Magnuson-Moss Warranty Act*, 66 CALIF. L. REV. 1, 8 (1978) (explaining that the definition of written warranty under the MMWA "indicates that some conduct that can give rise to liability under the U.C.C. will not be deemed to create 'written warranties' under Magnuson-Moss."). For example, under Massachusetts law express warranties do not need to be in writing, nor is there a specific requirement, as there is under the MMWA, that the affirmation of fact relate to defect-free performance or expected performance for a specified duration of time. *Compare* Mass. Gen. Laws ch. 106, § 2-313, *with* 15 U.S.C. § 2301(6)(a).

Wesson Oil is '100% Natural' is not an assertion that the product is defect free or that it will meet a specific level of performance over a specified period of time."); *In re Sears, Roebuck & Co.*, 2006 WL 1443737, at *4 (N.D. Ill. May 17, 2006) (holding that the phrase "made in USA" is a "product description that does not inform consumers that the tools are defect free"). Whether statements that describe a product's anticipated performance constitute written warranties under the MMWA is less clear.  *Compare Schechner v. Whirlpool Corp.*, 237 F. Supp. 3d 601, 615 (E.D. Mich. 2017) ("Whirlpool's advertisement—that the oven would self-clean in under an hour—makes no affirmative promise of defect-free performance."), *and Forcellati v. Hylands, Inc.*, 2015 WL 9685557, at *6 (C.D. Cal. Jan. 12, 2015) (holding guarantee that homeopathic cold and flu remedies would be "fast and effective" was not a warranty that product was defect-free), *and Bowling v. Johnson & Johnson*, 65 F. Supp. 3d 371, 378 (S.D.N.Y. 2014) (stating that assertion that toothpaste "restores enamel" was not a promise of performance over time), *with Ruszecki*, 2015 WL 6750980, at *4-5 (holding that statements that homeopathic remedies could "reduce everyday stress" and alleviate sleeplessness and irritation were written warranties under the MMWA), *and Dorsey v. Rockhard Labs., L.L.C.*, 2014 WL 4678969, at *9 (C.D. Cal. Sept. 19, 2014) (holding that statements that product was a fast and effective sexual performance enhancer for men gave rise to plausible claim for breach of written warranty under the MMWA).

The alleged "drop-fire" defect in the P320 has been the basis for similar litigation elsewhere in the country.  In *Gordon*, 2020 WL 4783186, at *8, the court dismissed an MMWA claim for breach of written warranty, holding that defendant's promotional statements that the P320 "will not fire unless you want it to" was not a guarantee that the weapon's firing mechanism was defect-free, nor was a description of the P320 as "drop-safe" an affirmative

promise of defect-free performance. In contrast, the court in *Ortiz v. Sig Sauer*, 448 F. Supp. 3d 89, 104 (D.N.H. 2020), denied a motion to dismiss an MMWA claim for breach of written warranty. In *Ortiz*, the court held that defendant did provide a written warranty when it stated in promotional materials that the drop-safe design of the P320 prevented the gun from firing without a trigger pull. *Id.* Other cases addressing potential violations of the MMWA have construed the claims according to substantive state-law requirements and have not applied the definition of "written warranty" as set forth in the MMWA. *See Ahern v. Sig Sauer, Inc.*, 2021 WL 5811795, at *3 & n.4 (D. Mass. Dec. 7, 2021) (dismissing MMWA claim when state-law implied-warranty claims failed); *Hartley v. Sig Sauer, Inc.*, 2019 WL 11639620, at *4-5 (W.D. Mo. Mar. 25, 2019) (applying state-law standard for breach of express warranty to claim for breach of written warranty under the MMWA).

Here, the promotional and advertising statements alleged by plaintiff do not satisfy the requirements for written warranties under the MMWA. As the court in *Gordon* noted, statements such as the P320 "will not fire unless you want it to" or is "drop safe" are more akin to a product description than a specific warranty that the trigger assembly or firing mechanism is defect-free.

Moreover, a warranty sufficient to support a claim for violation of § 2308 is typically not an advertising statement, but rather a warranty that is labeled as such, replete with explicit terms concerning product guarantees and the recourse for consumers when those guarantees are not met. *See e.g.*, *Carlson v. Gen. Motors Corp.*, 883 F.2d 287, 290 (4th Cir. 1989) (examining under § 2308(b) automobile manufacturer warranties on diesel engines of specific duration and extent that also expressly limited the operation of implied warranties under state law); *Hoffman v. Daimler Trucks N. Am., L.L.C.*, 940 F. Supp. 2d 347, 352, 359 (W.D. Va. 2013) (stating that

disclaimer of implied warranties violated § 2308 when manufacturer had provided a written twelve-month general warranty); *Milicevic v. Mercedes-Benz USA, L.L.C.*, 256 F. Supp. 2d 1168, 1173-74, 1179 (D. Nev. 2003) (concluding that § 2308(c) prohibited any "disclaimers, modifications or limitations" of a new-car warranty, which was set forth in a booklet of at least 33 pages); *Bush v. Am. Motors Sales Corp.*, 575 F. Supp. 1581, 1582-83 (D. Colo. 1984) ("The warranty at issue here is an express 'limited warranty' which provided for repair or replacement of certain parts for a period of 12 months or 12,000 miles from the date of delivery."); *cf. Dolores v. Gen. R.V. Center, Inc.*, 398 F. Supp 3d 184, 188 (E.D. Mich. 2019) (examining explicit terms of a purchase agreement disclaiming manufacturer warranty). Accordingly, a generic advertising statement made in promotional materials is not a written warranty that gives rise to a substantive cause of action under § 2308.

### 2. State-Law Cause of Action under the MMWA

The complaint also cursorily alleges that defendant violated express and implied warranties, thereby giving rise to a cause of action under the MMWA. (Compl. ¶¶ 176-77). Ostensibly, plaintiff sought to allege a cause of action under state law that could serve as a substantive basis for his MMWA claim.

Defendant contends that the lack of a viable state-law warranty claim precludes plaintiff's claim under the MMWA. Specifically, defendant argues that the complaint fails to allege any statements that contained "affirmations of fact" that could qualify as an express warranty or any evidence that plaintiff's injuries were the result of his reliance on those statements.

As a threshold matter, it is not entirely clear how a claim for a violation of express warranty under state law fits within the framework of the MMWA. As discussed, the statute's definition for written warranty is more restrictive than the definition of express warranty provided by the U.C.C. By the terms of the statute, it appears that the MMWA differs from state

law in that it does not countenance claims for breach of oral express warranties. *Richardson v. Palm Harbor Homes, Inc.*, 254 F.3d 1321, 1325 (11th Cir. 2001) ("The Act's consumer-suit provision, for instance, supplies a federal remedy for breach of written and implied warranties, but not for oral express warranties, which remain the domain of state law."). What is uncertain is whether state law provides a concomitant or alternative definition for written warranty that serves as a basis for stating an MMWA claim. *Compare Pershouse*, 368 F. Supp. 3d at 191-92 (D. Mass. 2019) (dismissing MMWA claim because complaint failed to state a plausible claim for breach of express warranty under state law), *and Duncan v. Nissan N. Am., Inc.*, 305 F. Supp. 3d 311, 322 (D. Mass. 2018) ("Because the complaint pleads facts sufficient to state a claim for breach of express warranty," the complaint stated a claim for violation of the Magnuson-Moss Warranty Act.), *with Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1015 (D.C. Cir. 1986) ("Because the state law term 'express warranty' did not suit the limited federal purpose, Congress supplied a definition—one confined to 'written warranty'—that did."), *and Gordon*, 2020 WL 4783186, at *8 (dismissing MMWA claim, despite plaintiff's argument that he had substantively alleged a breach of express warranty under state law, because the MMWA defined the term "written warranty" without "tying the term to state law").

In any event, the complaint here fails to make sufficient allegations of a breach of an express warranty. To state a claim for breach of express warranty under Massachusetts law, "the plaintiff must demonstrate that the defendant promised a specific result and that the defendant failed to deliver on his promise and, therefore, breached the express warranty." *Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 438 (D. Mass. 2020) (quotation marks omitted). "Furthermore, in an express warranty claim, plaintiff must show reliance on such warranty." *Id.* (quoting *Sprague v. Upjohn Co.*, 1995 WL 376934, at *3 (D. Mass. May 10, 1994)). The complaint fails

to allege anything more than general statements in the implied warranty claims that plaintiff relied upon defendant's representations.  Nowhere in the complaint does it state the elements for a breach of express warranty claim and apply relevant facts to those elements.  Thus, the complaint fails to allege facts "respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi*, 513 F.3d at 305 (1st Cir. 2008).  Furthermore, "[i]t is not merely enough to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put the flesh on its bones." *United States v. Zannino*, 895 F. 2d 1, 17 (1st Cir. 1990).  "[L]itigant has an obligation to spell out his arguments squarely and distinctly . . . ." *Id.* (quotation marks omitted).

Defendant also contends that the claim for implied warranty of merchantability sounds in tort and that the MMWA does not permit the recovery of personal-injury damages.[6]  Plaintiff concedes as much, and case law supports that proposition.  *See Voelker v. Porsche Cars N. Am., Inc.*, 353 F.3d 516, 525 (7th Cir. 2003) ("[P]ersonal injury claims based on a breach of warranty are not cognizable under the Magnuson-Moss Act.").  Plaintiff makes no argument as to whether his implied warranty of merchantability claim allows for relief beyond compensation for personal injury that would allow it to remain viable under the MMWA.

Accordingly, and for the foregoing reasons, the motion to dismiss Count 8 will be granted.

## IV.  Conclusion

For the foregoing reasons, defendant's motion to dismiss is GRANTED as to Counts 1, 4, and 8, and otherwise DENIED.

---

[6] Because the claim for implied warranty of fitness of purpose fails, it cannot serve as the basis for a claim under the MMWA.

**So Ordered.**

                                                    /s/ F. Dennis Saylor, IV
                                                    F. Dennis Saylor, IV
Dated: December 21, 2021                         Chief Judge, United States District Court