

**G&G FIREARMS EXPERTS**

*Firearms Technology, Design and Use Experts*

George A. Danas
Greg A. Danas
*Firearms Experts*

February 21, 2023

Stephen Semenza, Esq.
Kelly & Associates Injury Lawyers
83 Atlantic Avenue # 202
Boston, MA 02110

Re: Collette v. Sig Sauer

Attorney Semenza,

    I am providing this report to your firm with the understanding that G&G Firearms Experts has not had the opportunity to examine the recovered spent 9mm cartridge casing recovered from Officer Collette's P320 pistol. G&G Firearms Experts has continued to request the opportunity to examine this spent cartridge casing that may be in possession of the Massachusetts State Police.

**BACKGROUND**

    The incident involving Officer Collette concerns a Sig Sauer P320 semi-automatic pistol loaded with 9x19mm ammunition. On the date of incident, Officer Collette was in possession of his departmental P320 pistol that he removed from his duty holster, wrapped in a shirt, and placed in his over the shoulder carry bag. Thereafter, the handgun discharged, striking Officer Collette. The Massachusetts State Police took custody of the firearm and related ballistics after Mr. Collette was injured. Massachusetts laboratory report number #1918672 has identified the spent cartridge casing as having been fired from the subject P320 9mm pistol possessed by Mr. Collette. The handgun's serial number is #58C351126. G&G Firearms Experts viewed and inspected the subject handgun on two occasions. On July 13th, 2022 a CT analysis was performed at North Star Imaging (NSI) service lab in Marlborough, MA. Sig Sauer expert Mr. Derek Watkins examined Mr. Collette's service Sig Sauer P320 pistol, along with Mr. Danas of G&G Experts. The CT analysis aimed to determine the internal physical state of the striker and primary sear notch engagement post-incident. On February 7th, 2023 G&G Experts performed its own examination including test firing and toolmark identification. To date, G&G Experts has learned of multiple reported P320 handgun accidental/unintentional discharges across the country.

Corporate Mailing Address    G + G Firearms Experts, Inc.    406 Mason Road    Milford, New Hampshire 03055
Forensic Science Laboratory   164 Andover Street   Lowell, Massachusetts 01852   tel: 978.833.7255   fax: 978.459.0312   www.firearmsexperts.com

1

## CT ANALYSIS at NSI

Sig Sauer expert Mr. Derek Watkins evaluated the subject handgun. The overall evaluation was described in five steps.
1. Function test
2. CT scan
3. Radiology scans
4. Holster examination
5. Internal physical examination

## THE RESULTS

A functional test on the subject P320 pistol showed no anomalies. The examiner reviewed the CT images after completing the scans with no abnormalities. The CT scan revealed the present internal state of the handgun. The image scan displayed the striker in 100% contact with the primary sear notch. The radiography images show no anomalies. The handgun was cycled and dry-fired ten times and imaged ten times. The alignment of the striker and sear appeared to have full engagement through the ten cycles. The physical examination of the holster revealed it was unlikely for the handgun to be improperly holstered during the unintended discharge. The bottom of the holster was cracked and partially missing, indicating that the handgun was properly holstered during the discharge. This was concluded based on a comparison of the orientation of the barrel relative to the internal bottom 'post' of the holster. Upon the second examination of the subject holster at the G&G Lab, it was determined that the muzzle was attached to the internal post of the holster upon discharge. The projectile path within the holster demonstrates the muzzle position. Examination required dismantling to observe the internal mechanism/mechanical action. There was no difficulty in dismantling the components. There were no apparent signs of unusual wear on surfaces other than from ordinary use. The firearm was reassembled, and the expert conducted trigger-pull tests and results were found within factory specifications.

## G&G's TEST FIRING/PHYSICAL & TOOLMARK EXAMINATION

On December 7th, 2022, G&G Firearms Experts formally informed Attorney Semenza about the need to examine the Collette handgun at its laboratory in Lowell, MA. Since the first examination did not allow for test firing live ammunition, G&G Experts requested the opportunity to function fire Mr. Collette's handgun for operability. On February 7th, 2023 the test firing of the subject handgun occurred at the Littleton Sportsmen's Club in Littleton, MA. The examination consisted of the following:

    A) To examine the subject handgun possessed by officer Collette along with related magazines, holster, and ammunition.
    B) To function-fire the subject handgun with supplied ammunition provided by the Somerville Police Department.

2

C) To perform microscopy on the test-fired cartridge casings created by G&G Experts and to compare these casings to the recovered spent cartridge casing from the subject handgun. Note: The spent casing recovered from Mr. Collette's handgun was not available for examination.

D) To reinspect the subject Safariland holster carried by Officer Collette on the date of the incident.

E) To request that the Summerville Police Department provide the Safariland department-issued exemplar holster consistent with the holster worn on the incident date.

The examination consisted of digital photography of all related equipment and the subsequent firing of the incident firearm. After the completed test firing, the Somerville police officer transported the evidence to G&G Experts laboratory for microscopic examination of the spent cartridge. G&G's toolmark analysis revealed the normal operation of the subject handgun. The G&G discharged cartridge casings are maintained in evidence at the G&G Firearms Experts laboratory.

The Somerville Police Department, Sig Sauer expert, and Sig Sauer attorney were present to observe all examinations and testing. The Somerville Police Department maintained evidence chain of custody.

**G&G's Opinion Regarding Unintended Discharge of Officer Collette's Sig Sauer P320**

**THE HISTORY, SELECTION, AND TRANSITION OF THE US MILITARY COLT 1911 .45, BERETTA M9/92F 9MM, & THE SIG SAUER M17/P320 9MM**

In recent years, the United States military has chosen the Sig Sauer M17 9mm pistol as its primary handgun for the US Armed Forces. Before selecting the M17 9mm pistol, the US military maintained the Beretta M9 9mm pistol for its armed forces for approximately 40 years. The evolution of the US Military sidearm has evolved over the last 120+ years from the John Browning-designed model 1911 .45 caliber single action pistol to the Beretta M9 9mm traditional double action (double/single action) design and thereafter onto the Sig Sauer M17 9mm, striker-fired, single action pistol.

**THE COLT 1911 .45 CALIBER PISTOL**

The Colt 1911 pistol provided the United States military with an intimidating .45 caliber projectile which its enemies feared. The selection of the model 1911 pistol was warranted and developed due to the ineffective performance of the .38 caliber revolver cartridges before World War One. The single-action trigger design of John Browning has been recognized as the most popular military handgun design on the planet since its evolution. The 1911 model has been used worldwide by militaries, municipalities, and recreational users alike. Unlike John Browning's single-action design, today's more modern sophistication in handgun development has evolved

3

away from the single-action 'cocked and locked' model. During the 1980s, it became evident that the US military required a new firearm to modernize its armed forces and fulfill many requirements, such as selecting an appropriate caliber and a mechanically superior trigger mechanism. The single-action trigger capabilities of the 1911 pistol were deemed inappropriate, as the government chose to alleviate itself from the volatility of the 'single-action' trigger mechanism. Many determining factors such as safety, ease of use, accuracy, and above all else, safe user adaptability, i.e., development and implementation of human factors engineering criteria, would define a chosen firearm other than the Colt 1911 pistol. The government's transition from the 1911 single-action trigger-pull weight of between five and seven pounds was a primary safety concern. The US government needed to ensure it had selected the world's safest and most reliable handgun - the selection of the Beretta M9.

**THE BERETTA M9**

The selection of the Beretta M9 increased the handgun's potential to be maintained, carried, and fired while achieving the highest level of safety for the user. Behavioral/training issues with the new handgun became necessary as it required user awareness and adaptation to the newly presented double/single action trigger and manual downward activated safety/de-cocker. The double action trigger, manual safety, and de-cocker provided security and safety that has memorialized the M9 as one of the safest handguns in US history. Transitional handgun familiarity training by the US Armed Forces and many federal and state municipalities was adopted to newly devised training policies and procedures. Unlike the Colt .45 caliber 1911, which possessed a single action trigger pull of approximately 5 to 8 lbs, the Beretta M9 maintained a 12 +/- lb traditional double/single action trigger. During the 1980s, the US Military recognized selected a new sidearm that eliminated the likelihood of unintended discharges. By selecting a handgun that significantly increased trigger pull upon the first shot, the user would consciously apply sufficient energy to actuate the double action first shot capability. The double action/single action capabilities of the Beretta M9 handgun allowed its users to prevent an unintended discharge due to the heavy double action trigger pull and with an addition of a 'de-cocker' that doubled as a manual safety. By design, the double action trigger pull of the Beretta M9 has a 'trigger travel' of approximately one (1) inch as the trigger is pulled *before* the handgun sear releases the hammer. Thereafter, the handgun's cycle of operation positions the firing mechanism into a cocked single action condition, requiring trigger manipulation of approximately one-third (1/3) of an inch trigger travel to discharge. By design, the Beretta M9 double-action trigger mechanism requires *sufficient energy* to actuate the double-action firing mechanism, providing greater preventative assurance in alleviating unintended discharges. It is evident why the US military selected the Beretta M9 handgun, as its reputation is one of the safest handguns in military history.

.

4

**THE SIG SAUER M17/P320**

The evolution of the striker-fired handgun introduced in the late 1970s by Glock was a revelation in handgun technology design and use. The Glock polymer frame revolutionized handgun manufacturing by incorporating synthetics within the frame design, consistent with the development of most modern law enforcement and recreational handguns. There were many factors in selecting a specific handgun for the US military, two of those being the choice of selecting a 'traditional double action' or a 'striker-fired' trigger mechanism. The US military has since selected a striker-fire handgun due to the consistency within the trigger pull weight, which in turn is directly related to the increased accuracy of the user. The US government selected a firearm with a consistent trigger pull that enhanced the user's ability to achieve greater accuracy. The features attributed to greater accuracy within the handgun design are directly related to the trigger. The lighter weight of a trigger pull directly reduces the energy and torque necessary to actuate the trigger, resulting in a steadier, more accurate shooter. The polymer-framed Sig M17 was selected as the Army's Modular Handgun. The selection of the M17 has, with expectation, captured the attention of police departments and the public alike. A polymer striker-fired handgun, the M17 possesses a single-action trigger pull of approximately 5.5 lbs to 6.5 lbs of force. The P320 trigger take-up or pre-travel requires about 1/3 of an inch of travel and minimal force to actuate to the breaking point. Testing the Collette P320 determined its trigger pull required 5.5 lbs to 6.5 lbs of force to release the striker from the sear. The actuation force required to overcome the sear resistance during the break is the trigger weight, which is measured in pounds with a force gauge or direct trigger weights. The Collette Sig P320 trigger pull was determined to be within factory specifications.

The selection of the M17 pistol has offered an alternative to the Beretta M9, although with a point of consideration regarding personal safety that to this day has been overlooked. To date, multiple complaints have been documented where the P320 pistol has been claimed to have fired without manual activation of the trigger. Claims of unintended discharges may or may not include the likelihood of the user actuating the trigger of their gun and this has yet to be determined. The Sig P320 possessed by Officer Collette has been determined to be mechanically sound by both firearm experts.

The transition of the Sig P320 inadvertently introduced a handgun that was detrimental to the health and well-being of the Somerville police officers. The Somerville Police Department had previously carried the Sig P229 Double Action Only (DAO) for over the past 20+ years. Before selecting the Sig P320, the Somerville Police Department had trained with a handgun with a consistent trigger pull of greater than 10 lbs on each and every trigger pull attempted by every officer on every cartridge for the last 20+ years. The P320 handgun manual does not address the training issues related to transitioning from a DAO pistol possessing a 10+ lbs trigger pull to a single action trigger pull of 5.5-6.5 lbs. When handgun transitioning takes place, warnings must be introduced to the user. Warnings that identify the simplicity of directing a

5

handgun into a holster would now need to be discussed due to the likelihood of an unexpected piece of clothing coming into contact with the trigger. Since the trigger requires minimal travel and pressure to actuate, the user must be made keenly aware that an unintentional discharge is likely to occur. The Sig P320 manual would need to address the significant difference in trigger travel due to the fact that the P320 single action trigger only requires 1/3-inch travel before discharge.

Safety factors to consider:
- Trigger Pull Distance: The <u>shorter the distance</u>, the easier to fire, but also easier to fire negligently.
- Trigger Pull Weight: The <u>lighter the trigger</u>, the easier to fire, but also easier to fire negligently.

Behavioral training requirements addressing these issues were not suggested nor provided by Sig Sauer's handgun manual. The ordinary firearms trainer may not have the required skills to be aware of the need for transitional training, as mentioned above. There is a reasonable expectation that a firearm manufacturer would warn as to the requisite behavioral expectations required to maintain firearm safety during the transitional period from two very different handgun designs. To acknowledge the necessity of refinement in the transitional training of 'daily' gun handling skills is paramount in this instance, as probable and unintended discharges are likely to occur.

The distribution of the P320 handgun that *does not possess a manual trigger or frame/slide-mounted safety* and whose trigger travels 1/3 of an inch prior to discharge <u>has and will</u> contribute to unintended discharges for the foreseeable future. Additionally, those not forewarned of the mechanical shortcomings of the P320 will fall victim due to the lack of trigger safety when the handgun inadvertently contacts an object other than the user's trigger finger. Unlike the Somerville Police Department duty gun for over twenty years, the Sig Sauer P229 DAO required over one inch of trigger travel and maintained a trigger pull weight over 10 lbs to discharge a chambered cartridge. By comparison, the Sig P320 handgun requires only 1/3 of an inch of trigger travel and approximately half the trigger pull force to discharge a cartridge. Sig Sauer has not addressed within its P320 firearm manual adequate training suggestions or safety warnings as to the reasonable expectation of the likelihood of unintended discharges that could occur if the user does not completely familiarize his/herself with the variable mechanical features of its pistol design, i.e., single action 6 lb striker fired trigger that does not possess a 'trigger safety' or manual frame, grip or slide mounted safety. The primary goal of firearm safety starts with people learning how to interact with a mechanical object.

6

**"Firearm safety is the user's responsibility."** – Sig Sauer P320 Manual
Injury to Officer Collette was inevitable due to the following reasons:

1. The subject P320 was not in the hands of Officer Collette when it discharged; therefore, criminal, or negligent <u>discharge</u> cannot be claimed.

2. The subject P320 was not in the hands of Officer Collette when it discharged; therefore, improper, or careless <u>handling</u> cannot be claimed.

3. Officer Collette did not physically modify the subject P320 pistol; therefore, an 'unauthorized modifications' argument cannot be made.

4. The ammunition in Officer Collette's P320 was not defective, improper, hand-reloaded, or re-loaded ammunition.

5. The subject P32 was not determined to be corroded.

6. Officer Collette was not negligent when he placed his loaded handgun in his carry bag. Any ordinary user/police officer would have a reasonable expectation that a US - approved military sidearm would never be so sensitive that it would unexpectedly fire in such a condition.

7. Is it evident that Sig Sauer could and would have foreseen the unexpected human interaction with the mechanical trigger features of the Sig P320? Had personal safety considerations taken precedence regarding the ultimate decision to incorporate a trigger mechanism that is prone to unintentional or negligent discharge by the user, a corporate decision to incorporate a manual trigger safety into the design of the trigger, similar to the Glock design in addition to increasing the trigger travel and weight of the P320 would have alleviated Officer Collette's unexpected injury. If any defense of liability is claimed by Sig Sauer such as a 'failure to warn,' common logic will recognize that the primary goal of firearm safety starts with people learning how to interact with a mechanical object. It will be argued that it is always the user's obligation to assume responsibility no matter how a mechanical object is designed and how likely an injury is to occur. Common logic recognizes this philosophy is unsatisfactory.

8. Sig Sauer's Pistol Owner's Manual' P/N OM-P245-USA 6/1/01' & 'P/N 85019809-01 REV 01 Clearly states, "IMPORTANT: THE SAFEST PISTOL IS ONE THAT IS FULLY UNLOADED." Common knowledge recognizes this fact, although law enforcement standard operating procedures (SOP) directives commonly follow a 'loaded chamber' philosophy.

9. Sig Sauer's Owner's Manual, OM-P245-USA, states,

"The DAO differs from the standard pistol in several ways. FIRST, there is no single action position for the hammer. It returns to a decocked position after each trigger pull, so it can be fired only in double action mode. SECOND, because it is double-action only, there's only one trigger pull to learn. THIRD, because the hammer returns to a decocked position after each shot, there's no need for a decocking lever,"

Sig Sauer acknowledges a DAO trigger pull and informs that "the DAO differs from the standard pistol in several ways." Just as admission to the DAO trigger "differs in many ways," the newly introduced P320 trigger also differs in many ways. Variations in trigger designs increase the likelihood of inadvertent misuse, which must be immediately addressed. The Somerville Police Department's decision to maintain DAO pistols conditioned its officers to manipulate 'heavier' and 'longer trigger pulls' for thousands of rounds during its 20+ years of training. The shorter P320 trigger pull and lighter trigger weight are catalysts for future liability claims against the P320 trigger mechanism design.

10. The Sig Sauer P320 Operators manual lists a "WARNING" message on its first page. The 1.0 Safety Warnings message suggests, "Careless and improper handling of any firearm can result in an unintended discharge." As with other safety warnings, Sig Sauer has provided behavioral suggestions that would be expected from any firearm manufacturer. This measure of supervision is expected by both the law enforcement community and the general public. By comparison, if a lawn mower manufacturer proposed similar warnings and thereafter distributed a lawn mower with the pull cord placed close to the mower's cutting blade, the public would most expectedly utilize the pull cord with a catastrophic result. There is no difference here. Sig Sauer has asserted 'user responsibility,' although the user will not experience the unintended discharge until a piece of clothing tugs slightly at his/her trigger, causing an unintended discharge. A scenario such as this is inevitable and expected in the real world. Just documenting a safety concern is not a valid resolution to a highly probable unintended discharge waiting to happen. The P320 is a marvel of technology and design. Under ordinary use and directed training applications, the handgun may function flawlessly until someone's normal lifestyle interferes. Like a lawn mower with a pull cord close to the blade that will someday injure the user, the Sig P320 possesses mechanical trigger features highly susceptible to user error and expected injury. From a utility standpoint, this author believes Sig Sauer has incorporated 'target' features into a combat handgun which has, in the case of Officer Collette, revealed itself as a detriment to law enforcement and the general public as a whole. 'Target' features are typically incorporated into 'competition/target' guns designed to enhance accuracy for the user, allowing for a short trigger take-up and relatively light trigger pull. This design feature greatly improves accuracy for the recreational user. Had Sig Sauer introduced a heavier and longer trigger

8

pull mechanism on the P320 pistol, the general public, law enforcement, and the military would most likely conclude that the handgun's accuracy would significantly diminish. The manufacturer has rolled the dice by providing a handgun design that benefits the 'accuracy' concern for its marketing/contractual purposes, all the while a detriment to the user's safety. It is the author's expectation that Sig Sauer anticipated the trigger pull weight/travel argument by addressing its "ABUSIVE HANDLING" concern on page 3 of the P320 owner's manual. Alleviating itself of liability as such does not alleviate the general public of unexpected injury. The Sig P320 manual does not mention that the P320 does not have a manual safety! The manual continually reminds the user of its internal safety mechanisms, although with a false sense of security.

Pg. 2 reads, "Your firearm comes equipped with effective, well-designed safety features. However, never rely completely on any safety mechanism." Having touted the inherent safety of the handgun, Sig Sauer immediately redirects the user **not** to rely on its safeties and shifts the burden to the user. It may be revealing to some, but **the fact remains** that P320 fails to possess any type of manual safety.

11. Firearm manufacturers must consider reducing human error and enhancing safety, focusing on the interaction between the officer/ordinary firearm owner and his equipment.

12. It is evident that Sig Sauer will need to address these human factors engineering issues in the foreseeable future.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MASSACHUSETTS CONSUMER PROTECTION LAWS

## ATTORNEY GENERAL'S HANDGUN SAFETY REGULATIONS

The Attorney General's consumer protection regulations for handguns have been in effect since 1999. The regulations apply to "transfers (sales, leases, and rentals) of handguns by handgun-purveyors (dealers, wholesalers, and manufacturers) to consumers located in Massachusetts." The handgun regulations are codified in the code of Massachusetts regulations at 940 C MR 16.00.

In 1999, the office of the attorney general implemented regulations on handgun sales in sections defining:

A. Unfair or deceptive practices.

9

B. Tamper-resistant serial numbers.

C. Sale of handguns made from inferior materials.

D. Sale of handguns without childproofing or safety devices.

E. Safety warnings and disclosures.

F. Transfers of used handguns.

G. Severability.

H. Enforcement dates.

Section 16.05 of the Consumer Protection Regulation laws regarding handguns identified the <u>Sale of Handguns Without Childproofing or Safety Devices</u>. Section (2) of 16.05 reads as follows:

"It shall be unfair or deceptive practice for a handgun purveyor to transfer or offer to transfer any consumer located within the Commonwealth any handgun which does not contain a mechanism which effectively precludes an average 5-year-old child from operating the handgun when it is ready to fire; such mechanisms shall include, but are not limited to: **<u>raising trigger resistance to at least 10-pound pull</u>**, altering the firing mechanism so that an average 5-year-old child's hand are too small to operate the handgun; a design where the handgun requires a series of multiple motions in order to fire the handgun; and/or a hammer deactivation device,"

(Enforcement Dates of 940 CMR 16.05 shall apply to acts committed or practices in force as of September 30, 1998.)

The Attorney General of Massachusetts implemented regulations regarding handgun manufacturing design. Section 16.05 addressed the requirement to maintain a 10-lb trigger pull on all handgun sales in the Commonwealth. The Attorney General recognizes the need to integrate the safety requirements of a handgun's trigger mechanism to reduce the likelihood of unintended discharges. Although law enforcement is exempt from such regulations, the mere intention of the Attorney General's regulations supports the interest in safety and the need to increase trigger pull weights on handguns.

Had Officer Collette purchased a Sig Sauer P320 for his own personal use using his MA License to Carry, he would be in violation of MA Consumer Protection Regulations.

Before a handgun/purveyor can transfer new (and certain used) handguns in MA, the consumer protection regulations must be satisfied. The terms "handgun-purveyor" and "transfer" are among the terms defined in the regulations at section 16.01.

According to the Attorney General's Handgun Safety Regulations Enforcement Notice, the definition of "handgun-purveyor" includes, "a person or entity [Sig Sauer] that transfers handguns to a customer located within the Commonwealth of MA, but excludes: those who transfer less than 5 handguns per year; transfers for law enforcement and military; transfers for museums and educational collectors; transfers for the surrender of law enforcement or military personnel; transfers for antique firearms, as defined by federal law; and transfers of handguns specifically designed for formal target shooting competition."

It is evident that the transfer of the P320 pistol by Sig Sauer is excluded from the Consumer Protections Regulations when transferring to law enforcement and the military. However, Sig Sauer is prohibited from selling its handguns through federal dealers and any handgun-purveyor in the Commonwealth of MA. Failure to abide by the Consumer Protection Regulations by Sig Sauer, a civil infraction, may violate section 16.02: Unfair or Deceptive Practices. It is also unfair or deceptive practice for a handgun-purveyor to make material misrepresentations or false certifications regarding any handgun offered for transfer within the Commonwealth of MA. To date, Sig Sauer handguns are being transferred into Massachusetts without meeting the minimum trigger pull force requirements established by 940CMR 16.05. The P320 pistol and its variations do not meet the minimum trigger force requirements for MA distribution. See attached Attorney General's Handgun Safety Regulations Enforcement Notice.

*******************************

Thirty-nine years of experience in firearm repair, sales, hand grip design, training, use, and forensic ballistics examination will assist in my understanding of how likely such an event is to occur. However foreseeable, it is the obligation of the firearm manufacturer in this case to prevent future instances of unintended discharges. All opinions offered by G&G Firearms Experts are based on personal experience and related discovery provided in this case. A copy of G&G Firearms Experts Inc fee schedule, curriculum vitae, and cases in which I have been retained as an expert and testified within the last few years are included. If additional discovery materials are provided, they will be thoroughly reviewed and may impact the above opinions. If this should occur, these revised new opinions will immediately be revealed to the retaining party. I reserve the right to supplement and amend my opinions based on additional information provided to me. My fees are $275/hour per case review and $3,000 /day for deposition or trial expenses.

Submitted this 21st day of February 2023,

Greg A. Danas
President
G&G Firearms Experts, Inc.

ENFORCEMENT NOTICE:
ATTORNEY GENERAL'S HANDGUN SAFETY REGULATIONS

The Attorney General's consumer protection regulations governing handguns are now in effect. The regulations apply generally to "transfers" (sales, leases, and rentals) of handguns by "handgun-purveyors" (dealers, wholesalers, and manufacturers) to customers located in Massachusetts. Certain exceptions apply. Existing federal, state, and municipal laws, including those relating to handgun licensing, remain in effect.

The handgun regulations have been codified in the Code of Massachusetts Regulations, at 940 CMR 16.00. The regulations should be consulted for more comprehensive and specific information. This enforcement notice is for general informational purposes only. Only the regulations themselves have the force of law.

Background

The Attorney General promulgated the handgun regulations in October 1997 under the Massachusetts Consumer Protection Act, General Laws Chapter 93A, after public notice and hearings. The Massachusetts Supreme Judicial Court affirmed the authority of the Attorney General to issue the regulations, and these specific regulations were upheld after litigation.

The Attorney General will enforce the regulations pursuant to the Consumer Protection Act, through civil actions for injunctive relief, restitution, civil penalties (up to $5000 per violation), costs, and attorney's fees.

Requirements

Following is a brief summary of the consumer protection regulations, with some general guidelines as to their application.

Before a handgun-purveyor can transfer new (and certain used) handguns in Massachusetts, the consumer protection regulations must be satisfied. The terms "handgun-purveyor" and "transfer" are among the terms defined in the regulations at Section 16.01.

The definition of "handgun-purveyor" includes any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts, but excludes: those who transfer less than five handguns per year; transfers for law-enforcement and the military; transfers for museums and educational collectors; transfers for the surrender of handguns to law-enforcement or military personnel; transfers of antique firearms, as defined by federal law; and transfers of handguns specifically designed and sold for formal target shooting competition.

All transfers of handguns, including current inventory, are now subject to these regulations. Under the regulations, "transfer" means sell, rent, or lease. However, it does not include sales to a business entity that is primarily a firearm wholesaler, if the sale by its terms prohibits the purchaser from reselling the handgun to a handgun retailer or consumer in Massachusetts.

    a. **Safety Warning/Disclosure Requirements (Section 16.06)**

Handgun-purveyors must:

* provide a specific written safety warning to customers;

* explain to retail customers how to safely load, unload, and store the handgun; show how to operate all safety devices; and note the absence, if any, of a load indicator, a magazine safety disconnect, or an internal safety; and

* for handguns with barrels shorter than three inches, disclose to all customers, in writing with specific test data, the accuracy limitations of the weapon.

b. Safety and Performance Standards (Sections 16.03, 16.04, 16.05)

All new (and certain used) handguns that are transferred must meet minimum safety and performance standards.

If you are a handgun-purveyor, listed below are the requirements that must be met in order for your sales of handguns to comply with the Attorney General's regulations. If you are unsure whether the make and model of handguns you are selling or otherwise transferring meet these additional requirements, you should be able to obtain that information from the manufacturer.

* Does the handgun have a tamper resistant serial number (Section 16.03)? If the handgun has a "hidden" serial number, or the serial number is stamped into the handgun in such a way as to make it resistant to tampering, it should comply. If you do not know whether the handgun has a tamper resistant serial number, contact the manufacturer.

* Does the handgun meet the Make and Model Performance Requirements under the regulations (Section 16.04)? If the working parts of the handgun, specifically the frame, barrel, cylinder, slide, and breechblock, are made entirely of steel, it should comply. If you are not sure, ask the manufacturer. If these parts of the handgun are not made entirely of steel, ask the manufacturer whether the make and model of the handgun has passed the 600-round performance test specified in the regulations.

* Is the handgun prone to repeated firing based on a single pull of the trigger, prone to explosion during firing, or prone to accidental discharge as defined in the Attorney General's regulations (Section 16.04(2))? If you are not sure, ask the manufacturer whether the make and model passes the drop test specified in the Attorney General's regulations.

* Is the handgun being sold with a lock approved by the Colonel of the State Police, as required by G.L. 140, Section 131K (Section 16.05(1))? Regardless of whether the handgun was sold or transferred to you with a lock, you must ensure that it has an approved lock when you sell it. You can comply with this regulation by including an approved lock with the handgun when you sell it.

* Does the handgun have built-in childproofing protection (Section 16.05(2))? If you are unsure whether the handgun meets the Attorney General's childproofing requirements, you can ask the manufacturer. A handgun will meet these childproofing requirements if it contains a mechanism that effectively precludes an average five year-old child from operating the handgun when it is ready to fire, including but not limited to: a trigger resistance of at least a ten-pound pull; a firing mechanism that makes it so that an average five year-old child's hands are too small to operate the handgun; a design where the handgun requires a series of multiple motions in order to fire the handgun; and/or a hammer deactivation device.

* If the handgun is a semiautomatic pistol, does it have either a load indicator or a magazine safety disconnect (Section 16.05(3))? Again, if you are unsure, ask the manufacturer.

c. Unfair or Deceptive Practices Generally (Section 16.02)

The regulations make it an unfair or deceptive practice, for purposes of the Consumer Protection Law, for any handgun-purveyor to fail to comply with the regulations or with any other local, state, or federal law whose implementation serves to protect consumers from unfair and deceptive practices by means including the regulation of sales. These laws include, for example, those that: forbid the sale of handguns to juveniles, addicts, or mentally-incompetent persons; forbid the sale of silencers, armor-penetrating bullets, and machine-gun pistols; forbid the obliteration of serial numbers prior to sale, or selling handguns whose serial numbers have been defaced; require sellers to keep records of handgun sales; forbid sellers from delivering or transporting loaded handguns; and forbid the delivery of handguns to the custody of a minor.

It also is an unfair or deceptive practice for a handgun-purveyor to make material misrepresentations or make false certifications regarding any handgun offered for transfer.



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1698

TOM REILLY
ATTORNEY GENERAL

May 2000

(617) 727-2200

### ENFORCEMENT NOTICE #2
### ATTORNEY GENERAL'S HANDGUN SAFETY REGULATIONS

The Office of the Attorney General is now enforcing its consumer protection regulations governing handguns. In the interest of promoting and ensuring compliance with these regulations, the Attorney General is issuing this Enforcement Notice to highlight various aspects of the regulations and the manner in which this office will enforce them. This Enforcement Notice is issued by the Attorney General in the exercise of his discretion, and in accord with the applicable statutory, regulatory, and judicial authorities.

The regulations apply generally to all "transfers" (sales, leases, and rentals) of handguns by "handgun-purveyors" (dealers, wholesalers, and manufacturers) to customers located in Massachusetts. Certain exceptions apply. Existing federal, state, and municipal laws, including those relating to handgun licensing, remain in effect.

*The handgun regulations are codified in the Code of Massachusetts Regulations, at 940 CMR 16.00. Please consult the regulations, and the Enforcement Notice previously issued by this office, for more comprehensive and specific information. This Enforcement Notice is for general informational purposes only. Only the regulations themselves have the force of law. Questions regarding the application of these regulations to your specific circumstances should be directed to your attorney, if necessary.*

1. **ENFORCEMENT DATE**

    The Attorney General will enforce the regulations with respect to any transfers of handguns that handgun-purveyors made to customers in Massachusetts on or after April 3, 2000. A "transfer" takes place upon the physical delivery of the handgun to the customer.

2. **TRANSFERS OF NEW AND USED HANDGUNS -- MANUFACTURE DATE**

    The Attorney General will enforce the regulations as follows:

    **Guns manufactured on or before October 21, 1998**
    If a handgun-purveyor transfers a new or used handgun that was manufactured on or before October 21, 1998, the handgun must meet applicable requirements of sections 16.05(1) and 16.06 of the regulations. That means it must have an approved lock, and the dealer must provide the appropriate written and verbal warnings and disclosures upon transfer of the handgun. The other requirements of the regulations will not apply.

    **Guns manufactured after October 21, 1998**
    If a handgun-purveyor transfers a new or used handgun that was manufactured after October 21, 1998, the handgun must meet all requirements of the regulations applicable to that make and model of handgun.

### 3. HANDGUNS PRONE TO ACCIDENTAL DISCHARGE

Section 16.04(2) of the regulations prohibits the transfer of any make and model of handgun that is "prone to accidental discharge." Under section 16.01 of the regulations, a handgun is "prone to accidental discharge" when it is unable to pass the following test: "five handguns in new condition of the make and model in question shall be subjected to, and none shall discharge during, the Handgun Drop Test." (The Handgun Drop Test is explained in detail in section 16.01.)

In accordance with Part 2 of this Enforcement Notice, the Attorney General will enforce section 16.04(2) with respect to the transfer of any handgun, whether new or used, that was manufactured after October 21, 1998.

The test described above should not be performed on the particular handgun to be transferred. Rather, a new or used handgun manufactured after October 21, 1998, will not be deemed "prone to accidental discharge" if the handgun-purveyor can certify that the *make and model* of that handgun passes the test described above. Handgun-purveyors should obtain such information from the manufacturer.

### 4. RETURNS OF HANDGUNS TO CURRENT OWNERS

The definition of "transfer" in 940 CMR § 16.01 will not be considered to include a handgun-purveyor's return of a handgun to its owner where that handgun initially was delivered by the owner to the handgun-purveyor for the purpose of a consignment sale or a pawnbroker loan, or for the purpose of service or repair.

### 5. HANDGUNS ORDERED OR PURCHASED BEFORE APRIL 3, 2000, BUT NOT YET PHYSICALLY DELIVERED TO CUSTOMER

The physical delivery of a handgun to a customer in the Commonwealth on or after April 3, 2000, constitutes a "transfer" under the regulations, even if that customer ordered or paid for the handgun before April 3, 2000.

### 6. MAKE AND MODEL

"Make and model" is defined in 940 CMR § 16.01 as "any group of handguns, all of which are made by a manufacturer by the same method and according to the same design pattern and specifications." The Attorney General will recognize handguns to be the same make and model when they are identical in all respects except for differences in any one or more of the following features:

* Finish, including, but not limited to, bluing, chrome-plating, oiling, or engraving.

* The material from which the grips are made.

* The shape or texture of the grips, so long as the difference in grip shape or texture does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm.

* Any other purely cosmetic feature that does not in any way alter the dimensions, material, linkage, or functioning of the magazine well, the barrel, the chamber, or any of the components of the firing mechanism of the firearm.

4



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL
ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

TOM REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

February 2002

## ENFORCEMENT NOTICE #3
## ATTORNEY GENERAL'S HANDGUN SALES REGULATIONS (940 CMR 16.00)

The Attorney General is issuing this Enforcement Notice in order to further clarify how the handgun sales regulations (940 CMR 16.00) will be enforced. This Enforcement Notice is issued in the exercise of the Attorney General's enforcement discretion, and may be changed or rescinded in the future at the discretion of the Attorney General.

This Enforcement Notice specifically addresses how the new Approved Firearms Roster issued by the Secretary of the Executive Office of Public Safety will affect the enforcement of the Attorney General's handgun sales regulations.

### THE APPROVED FIREARMS ROSTER (G.L. c. 140, § 131-3/4; 501 CMR 7.00)

The Secretary of the Executive Office of Public Safety has compiled an Approved Firearms Roster pursuant to G.L. c. 140, § 131-3/4 and 501 CMR 7.00. The Secretary has determined that the firearm (handgun) models listed on this roster meet the requirements of G.L. c. 140, § 123, cl. 18-21 ("the Chapter 140 handgun product requirements").

Pursuant to 501 CMR 7.05, licensed dealers are prohibited from selling a firearm that is not listed on the Approved Firearms Roster, subject to certain specified exceptions. *For more information regarding the Approved Firearms Roster, please contact the Executive Office of Public Safety at (617) 727-7775 (www.state.ma.us/eops).*

A.   THE EFFECT OF THE APPROVED FIREARMS ROSTER ON THE ENFORCEMENT OF THE PRODUCT REQUIREMENTS SHARED BY CHAPTER 140 AND THE ATTORNEY GENERAL'S HANDGUN SALES REGULATIONS

Certain of the Chapter 140 handgun product requirements were modeled upon, and are substantially similar to, certain of the requirements of the Attorney General's handgun sales regulations (940 CMR 16.00). Specifically, the Chapter 140 handgun product requirements and the Attorney General's handgun sales regulations share requirements relating to:

5

- the composition of the handgun, and whether it malfunctions, breaks, or cracks
    940 CMR 16.04(1), (3)
    G.L. c. 140, § 123, cl. 18th

- whether the handgun is prone to accidental discharge (drop test)
    940 CMR 16.04(2)
    G.L. c. 140, § 123, cl. 19th

- whether the handgun is prone to multiple fires or explosion
    940 CMR 16.04(2)
    G.L. c. 140, § 123, cl. 20th

- the accuracy of short-barreled handguns
    940 CMR 16.06(3)
    G.L. c. 140, § 123, cl. 21st

In the exercise of his enforcement discretion, the Attorney General will not take enforcement actions with respect to the product requirements of the Attorney General's handgun sales regulations that correspond to the product requirements of Chapter 140 (listed above) -- if the handgun model is listed on the Approved Firearms Roster.

B. THE EFFECT OF THE APPROVED FIREARMS ROSTER ON THE ENFORCEMENT OF THE ADDITIONAL PRODUCT REQUIREMENTS OF THE ATTORNEY GENERAL'S HANDGUN SALES REGULATIONS

The Attorney General's handgun sales regulations include three product requirements that are not shared by the Chapter 140 handgun product requirements, and that are not tested for the Approved Firearms Roster:

- child-safety features
    940 CMR 16.05(2), (4)

- load indicators and magazine safety disconnects for semi-automatic handguns
    940 CMR 16.05(3), (4)

- tamper-resistant serial numbers
    940 CMR 16.03

A handgun that is listed on the Approved Firearms Roster might not satisfy these three additional product requirements. **If a handgun does not satisfy these three additional requirements, then it is a violation of the regulations for a handgun purveyor to transfer that handgun even if the handgun is listed on the Approved Firearms Roster.**

6

### C. THE EFFECT OF THE APPROVED FIREARMS ROSTER ON THE ENFORCEMENT OF THE ATTORNEY GENERAL'S REGULATIONS RELATING TO HOW HANDGUNS ARE TRANSFERRED

The Attorney General's handgun sales regulations govern <u>how</u> a handgun is transferred in the Commonwealth (the manner of transfer), in addition to <u>which</u> handguns are transferred. The regulations dealing with the manner of transfer relate specifically to:

- <mark>unfair or deceptive practices generally</mark>
  940 CMR 16.02

- transfer with an approved safety device
  940 CMR 16.05(1)

- transfer with safety warning
  940 CMR 16.06(1)

- transfer with a safety demonstration (retail only)
  940 CMR 16.06(2)

- transfer with accuracy information (short-barrel only)
  940 CMR 16.06(3)

These requirements of the Attorney General's handgun sales regulations concerning the manner of transfer continue to apply to the transfer of handguns regardless of whether the handgun itself satisfies the product requirements of Chapter 140 and the Attorney General's regulations.

ENFORCEMENT NOTICE #3.wpd

7

July 16, 2004 Consumer Advisory on Glock Handguns

## CONSUMER ADVISORY

### ATTORNEY GENERAL'S ADVISORY ON GLOCK HANDGUNS

**BOSTON** - Attorney General Tom Reilly has learned that gun dealers recently began selling Glock handguns to Massachusetts consumers, after the company represented that the handguns were in compliance with the Attorney General's Handgun Sales Regulations.

AG Reilly's Office has notified Glock, Inc. that the "extractor indicator" device which the company recently added to its handguns is not an effective load indicator and, therefore, does not comply with the handgun regulations. The AG's Office reached this determination after consulting with firearms experts. In response, Glock has recalled all handguns shipped to dealers and distributors in the Commonwealth and ceased in-state sales.

AG Reilly offers the following information to consumers about Glock handguns:

• Glock handguns may not be sold to consumers in Massachusetts.

Handguns currently manufactured by Glock lack a load indicator or magazine safety disconnect, in violation of the handgun regulations. Therefore, handgun dealers may not sell newly manufactured Glock handguns to Massachusetts consumers.

Glock has instructed Massachusetts distributors and dealers to return all handguns. AG Reilly encourages all distributors and dealers to cooperate with Glock in this endeavor.

As always, the handgun regulations do not pertain to firearms used by law enforcement or military personnel as part of their official duties.

• Massachusetts consumers are encouraged to return recently purchased Glock handguns.

Glock has asked Massachusetts consumers who recently purchased handguns to return them for a full refund. Because the handguns lack an important device designed to promote the safety of gun owners and their families, AG Reilly encourages consumers to return these handguns.

• AG's Handgun Sales Regulations

The Attorney General's Handgun Sales Regulations fall under the state's consumer protection law and protect consumers and their families from unsafe handguns. The regulations require all handguns sold in Massachusetts to include certain safety and child-proofing measures and safety warnings.

The regulations require that all semi-automatic handguns contain either a magazine disconnect or a load indicator. The Glock handguns contain neither of these features.

The Attorney General's handgun regulations are intended to protect responsible gun owners and their families from firearms that are unsafe by design or manufacture. AG Reilly recognizes that there are many people in the Commonwealth who legitimately own firearms for hunting and sporting, and that those individuals use them in a responsible manner.

The Attorney General's Handgun Sales Regulations can be viewed at AG Reilly's website, http://www.ago.state.ma.us/sp.cfm?pageid=1579.

8